_____ FILED          _____ ENTERED
_____ LOGGED      _____ RECEIVED

SEP 2 4 2013

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF** | ) |
| | ) |
| NEW YORK DELI AND GROCERY | ) |
| 1207 W. Baltimore St | ) |
| Baltimore, MD 21223 | ) |
| | ) |
| And the adjoined residence of | ) |
| | ) |
| 1207 W. Baltimore St | ) |
| Baltimore, MD 21223 | ) |
| | ) |
| **IN THE MATTER OF THE SEIZURE OF** | ) |
| | ) |
| M&T Bank account number 9852702936 | ) |
| held in the name of | ) |
| "NEW YORK DELI & GROCERY" | ) |

**UNDER SEAL**

Criminal No. 13 -2216 SKG –

13 -2218 SKG

## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH AND SEIZURE WARRANTS

I, Jeffrey Weiland, being duly sworn depose and state the following:

## I.      INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2008. I am currently assigned to the Public Corruption squad in the Baltimore Division of the FBI. The Public Corruption Squad investigates crimes involving fraud against the government. As a Special Agent, I have investigated crimes including arson, forced labor trafficking, distribution of controlled substances, money laundering, possession of stolen goods in interstate commerce and racketeering.

2. This affidavit is based on my personal knowledge, as well as information obtained from documents, electronic databases, witnesses and other law enforcement officers involved in this investigation. The information contained in this affidavit is provided for the purpose of establishing probable cause for a search warrant and does not contain all the details of the case as they are known to me.

## II.    PURPOSE OF THE AFFIDAVIT

3.  This affidavit is submitted in support of the Government's application for issuance of a warrant to search the premises of NEW YORK DELI AND GROCERY (herein NEW YORK DELI), 1207 West Baltimore St, Baltimore, MD 21223 more specifically described in Attachment A1 and the adjoined residence of 1207 West Baltimore St, Baltimore, MD 21223 more specifically described in Attachment A2.

4.  I know from personal observations that NEW YORK DELI is a three story, brick building, located on the south side of the intersection of West Baltimore Street and North Carrollton Avenue. The building's upper two stories are painted beige or flesh tone, and the 1st floor is a store front with a recessed door in the center and a plate glass window on each side. There is a large sign above the store front that runs the width of the building. This sign reads "NEW YORK DELI GROCERY". The numbers "1207" are above the front door to the store. The store's entrance faces north onto West Baltimore Street.

5.  Based on the facts listed herein, there is probable cause to believe the owner of NEW YORK DELI committed criminal violations of the United States Code. There exists probable cause to believe that within the premises of NEW YORK DELI, to include all computers and locked containers therein, there is evidence of the commission of a crime, contraband, the fruits of a crime or things otherwise criminally possessed and instrumentalities of the crimes described below, including: fraud associated with the Supplemental Nutrition Assistance Program in violation of Title 7, United States Code, Section 2024 and wire fraud in violation of Title 18, United States Code, Section 1343.

## III.    THE SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM

6.  The Supplemental Nutrition Assistance Program (SNAP), formerly known as the Food Stamp Program, is a federally funded, national program established by the United States Government to alleviate hunger and malnutrition among lower income families. The United States Department of Agriculture (USDA) administers the SNAP through its agency, the Food and Nutrition Service (FNS). FNS is responsible for the authorization and

disqualification of retail food establishments participating in the redemption of SNAP benefits. Social service agencies from each state share responsibility with FNS for administration of the program through authorization and revocation of individual SNAP benefit customers.

7. In Maryland, the program is administered by the MD Department of Human Resources (DHR) and is known as the Food Supplement Program (FSP). In 1993, Maryland changed the issuance method of SNAP benefits from a traditional paper coupon system to an Electronic Benefits Transfer (EBT) system. DHR awarded Xerox (formerly ACS) the current network management contract for its FSP EBT system. The system is similar to those employed by financial institutions and credit card companies. FSP customers are issued plastic EBT cards which contain an embedded magnetic stripe that stores basic information required for food purchases. Retailers approved by FNS to accept SNAP are assigned an FNS authorization number and in some cases, are provided with a point of sale (POS) device to access the electronic funds allocated to a customer's EBT card (larger retailers use their own POS devices). POS devices communicate with the Maryland EBT central database to debit a customer's available SNAP benefit balance for the cash value of eligible food items purchased.

8. When an EBT card is swiped through a retailer's POS terminal, the store employee or customer, (depending on the type of POS device) must actively select SNAP/food stamp purchase as the transaction type from the POS terminal menu. The employee must then enter the total dollar amount of the transaction to be conducted. The transaction request is completed when the cardholder enters their unique personal identification number (PIN). This causes an electronic transmission of information through a series of network switches to the central Maryland EBT database located in Texas, which maintains customer account balance information. The EBT Contractor verifies the retailer is authorized to conduct SNAP EBT transactions. The Maryland EBT system verifies the amount of benefits available, authorizes the transaction and deducts the purchase amount from the customer's available balance. The system also calculates cumulative FSP sales for each retailer and authorizes electronic payments to the retailer's bank account.

3

9. Once the transaction is approved, information flows back to the POS terminal and the store employee receives confirmation that the cardholder's account has been successfully debited. Unlike the procedure with the original paper food stamp coupons, FSP EBT transactions are made for the exact amount of the sale and no change is given to the cardholder. SNAP reimbursements are paid to authorized retailers through a series of electronic funds transfers. On a daily basis, Xerox, located in Austin, Texas, reconciles accounts for participating MD SNAP retailers by drawing on funds available through an open letter of credit with the American Management Agent (AMA).

10. In order to participate in the SNAP as an authorized retailer, a business submitted FNS Form 252, Food Stamp Program Application for Stores. As part of that application, the owner/manager certified that they understood and agreed that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

11. Pursuant to the Food and Nutrition Act and regulations promulgated by the Secretary of Agriculture, SNAP authorized retailers may only accept SNAP benefits in exchange for eligible food items. SNAP benefits may not, in any case, be exchanged for cash (a practice commonly referred to as trafficking) or other forbidden items such as alcohol, paper products, tobacco products, lottery tickets, or fuel.

12. In accordance with Title 7 United States Code section 2024 and Maryland Code Section 8-503, SNAP benefits may be transacted only by members of the household to which they were issued. Any individual who is not a member of a given household may not use, obtain, or purchase that household's SNAP benefits.

## IV.    NEW YORK DELI SERVICE AND CONVENIENCE MARKET – 1201 West Baltimore Street, Baltimore, MD 21223

### A. Participation in the SNAP Program

13. A review of the FNS Form 252 on file for NEW YORK DELI disclosed that owner ABDO MOHAMED NAGI (NAGI) completed the form on or about January 18, 2011. According to computer application data, the street address listed was 1207 West Baltimore St, Baltimore, MD 21223. The firm was authorized as a SNAP retailer on February 1, 2011.

.4

14. A review of SNAP transactions at NEW YORK DELI, as recorded and monitored by FNS, disclosed patterns of suspicious SNAP transaction activity. The total monthly SNAP transactions conducted by NEW YORK DELI were much greater than those of similar sized stores located in the same area. In addition, a substantial number of those transactions were of an unusually high amount and/or conducted in rapid and repeated fashion. These patterns are consistent with illegal trafficking of SNAP benefits.

15. According to official records on file with FNS, as well as my direct observations, NEW YORK DELI is a very small convenience store which stocks a limited inventory of food and beverage products. Customers have to be "buzzed in" through the locked front door. The majority of the purchasable inventory is kept behind the counter with the owner/employee behind a barrier of ballistic glass. Items purchased have to be passed to the customer through the barrier using a small bank teller-type slot. This method, while safe, is not conducive or realistic for purchasing multiple items.

16. During the 28 month period from February 2011 thru the end of May, 2013, NEW YORK DELI redeemed a total of $1,273,836.65 in SNAP benefits. This averaged over $45,400.00 a month over the life of the SNAP license.

17. A review of FNS records disclosed NEW YORK DELI is classified as a convenience store (CS). FNS uses a classification system to aid in analyzing transaction activity and volume by SNAP authorized retailers. Retailers are assigned a classification based on store size, layout, inventory and reported annual sales volume. An analysis of NEW YORK DELI's monthly transaction volume for the period of January 1, 2013 thru the end of May 2013 as compared to the four closest stores also classified as convenience stores by FNS disclosed that NEW YORK DELI redemptions far exceeded those of the peer group. The analysis included CS-class stores similar in size to NEW YORK DELI, located within a .28 mile radius, which had no incidence of adverse criminal or administrative action during the review period and are not currently under investigation by OIG or FNS. NEW YORK DELI's total redemptions during that period were $323,611.13. The 4 sample stores together averaged $23,738.34 in sales during that same period. In addition, the average SNAP purchase at NEW YORK DELI was $44.27 during this time frame. The average SNAP purchase at the other 4 stores

5

in the sample is $6.20.   An excerpt of this analysis for the preceding 5 months is presented below.

**Table 1: Total amount of SNAP benefits redeemed and average purchase amount for January 2013 to May 2013**

| FNS Number | Store Name | Store Type | State | Total Dollars Redeemed | Total # of Purchases | Average Amount Per Sale |
|---|---|---|---|---|---|---|
| 0290620 | New York Deli and Grocery, Inc | CS | MD | $323,611.13 | 7,163 | $45.18 |
| 0240160 | Perez Grocery & Deli LLC | CS | MD | $74,586.59 | 10,960 | $6.81 |
| 0390670 | Nana Food Market | CS | MD | $12,362.09 | 2,221 | $5.57 |
| 0296130 | Baltimore St Laundry | CS | MD | $1,291.92 | 243 | $5.32 |
| 0394010 | MVP Mini Mart | CS | MD | $6,712.76 | 710 | $9.45 |

18. NEW YORK DELI consistently exceeded the statewide and monthly average redemptions for convenience stores during the same period.  NEW YORK DELI monthly SNAP redemptions exceeded the state average by more than $1,179,871.00 from February 1, 2013 thru May 31, 2013. Excerpts of these analyses for the preceding 28 months are presented below:

**Table 2: Total amount of SNAP benefits redeemed from 2/1/11 to 5/31/13 and average purchase amount**

| FNS Number | Store Name | Store Type | State | Total Dollar Volume | Total # of Purchases | Average Amt per Trans |
|---|---|---|---|---|---|---|
| 0290620 | New York Deli | CS | MD | $1,273,836.65 | 31,585 | $40.33 |
| | Average of all stores in MD | CS | MD | $93,964.86 | 10,171 | $9.24 |

19. A review of FNS records shows that the average purchase amount for a convenience store in Maryland from May of 2012 to May of 2013 was $9.40.  The average purchase amount for NEW YORK DELI during the same period was $44.27, an average that is almost 5 times greater than the average purchase amount for a store of its kind in Maryland.  This $44.27 purchase average is greater than the average for Supermarket (SM) class stores in the state of Maryland.  Furthermore, Stop Shop and Save, a Super Store (SS) class supermarket in Baltimore, MD, is located at 1101 Pennsylvania Ave.  This is only .83 miles away from

6

NEW YORK DELI. During the months of May 2012 through May 2013, Stop Shop and Save's average SNAP sale was $24.45. During the same time frame NEW YORK DELI averaged $44.27 per SNAP sale.

20. Undercover operations at NEW YORK DELI revealed that the store does not use laser barcode scanners to aid in the checkout process. There is only one cash register with a small counter. The register and counter are behind ballistic glass. All purchases, cash, credit cards, and EBT cards must be passed through a small banker-style window in the glass. There are no carts or hand baskets available for customers to carry large purchases while inside the store. The store also contains an abundance of non-eligible items, to include tobacco products.

### B. SNAP EBT Redemptions at New York Deli

21. A review of individual SNAP EBT transactions conducted at NEW YORK DELI disclosed that the store regularly conducts a high volume of transactions that match known patterns of illegal SNAP benefits trafficking activity. For example, during the month of May 2013, NEW YORK DELI conducted 1402 transactions for SNAP benefits. Of these transactions, 728 of them, or over half, exceeded the average single purchase amount of a Convenience Store in the state of Maryland by 300 percent or more; 318 of the 1402 transactions exceeded the MD state single purchase average by 1000 percent. A sample or these transactions are detailed below:

**Table 3: Transactions in May 2013 that exceeded the MD State purchase average ($9.29) by 300 percent or more**

| Household | Card Number | State | Date | Time | Amount |
|---|---|---|---|---|---|
| 452014261 | 6005289213075865 | MD | 05/19/2013 | 08:01:29 PM | $139.00 |
| 441014387 | 6005289028647114 | MD | 05/16/2013 | 04:07:09 PM | $137.00 |
| 66009726660F0 | 6004868938271855537 | NY | 05/02/2013 | 04:26:47 PM | $135.00 |
| 443014274 | 6005289030464706 | MD | 05/11/2013 | 06:07:20 PM | $135.00 |
| 434014383 | 6005280029171428 | MD | 05/12/2013 | 10:08:40 AM | $135.00 |
| 452014261 | 6005289213075865 | MD | 05/19/2013 | 08:00:19 PM | $135.00 |
| 435040408 | 6005280018161646 | MD | 05/21/2013 | 07:33:16 PM | $135.00 |
| 478013999 | 6005280029180544 | MD | 05/01/2013 | 10:52:51 AM | $132.00 |
| 491013619 | 6005280029172822 | MD | 05/24/2013 | 08:25:57 AM | $131.75 |
| 441014387 | 6005289028647114 | MD | 05/16/2013 | 04:07:39 PM | $129.97 |
| 458014911 | 6005280029171170 | MD | 05/11/2013 | 03:54:26 PM | $129.96 |
| 030877234 | 6005280021480769 | MD | 05/08/2013 | 10:25:30 AM | $129.95 |
| 030548100 | 6005280027776798 | MD | 05/09/2013 | 04:14:24 PM | $129.60 |
| 404014496 | 6005280027652957 | MD | 05/09/2013 | 03:36:39 PM | $127.08 |
| 478013999 | 6005280029180544 | MD | 05/01/2013 | 10:53:55 AM | $127.00 |
| 499011104 | 6005289029906428 | MD | 05/13/2013 | 07:57:24 PM | $126.65 |
| 413014772 | 6005289026923095 | MD | 05/07/2013 | 08:07:15 AM | $126.00 |
| 434014383 | 6005280029171428 | MD | 05/12/2013 | 10:09:46 AM | $125.00 |
| 404015855 | 6005280021697438 | MD | 05/12/2013 | 10:36:17 AM | $125.00 |
| 473016395 | 6005280029111440 | MD | 05/02/2013 | 03:00:39 PM | $124.99 |
| 470014282 | 6005280025473471 | MD | 05/08/2013 | 12:23:20 PM | $124.99 |
| 434014383 | 6005280029171428 | MD | 05/12/2013 | 10:10:18 AM | $124.99 |
| 499011104 | 6005289029906428 | MD | 05/13/2013 | 07:59:35 PM | $124.00 |
| 452014043 | 6005280021909064 | MD | 05/10/2013 | 08:28:00 AM | $123.00 |
| 438045603 | 6005280027746791 | MD | 05/14/2013 | 09:37:40 AM | $123.00 |
| 414020738 | 6005280027655778 | MD | 05/03/2013 | 10:22:46 AM | $122.00 |
| 401016358 | 6005280025739640 | MD | 05/08/2013 | 08:19:22 AM | $121.50 |
| 451003369 | 6005280018178236 | MD | 05/10/2013 | 09:05:20 AM | $121.35 |
| 435044495 | 6005280027744044 | MD | 05/11/2013 | 09:48:22 AM | $121.25 |
| 427012921 | 6005289024817893 | MD | 05/15/2013 | 10:30:56 AM | $121.00 |
| 030643150 | 6005280029169802 | MD | 05/14/2013 | 12:15:58 PM | $120.50 |
| 420045159 | 6005289028955426 | MD | 05/06/2013 | 02:14:42 PM | $119.98 |
| 496018333 | 6005280025791682 | MD | 05/11/2013 | 11:12:14 AM | $119.98 |
| 477007846 | 6005289031085690 | MD | 05/28/2013 | 01:50:54 PM | $119.97 |
| 428019533 | 6005289029861326 | MD | 05/06/2013 | 01:42:25 PM | $119.96 |
| 490014650 | 6005280030497342 | MD | 05/15/2013 | 12:41:46 PM | $119.96 |
| 030914433 | 6005289019259440 | MD | 05/07/2013 | 01:33:14 PM | $119.95 |
| 493042905 | 6005280027776137 | MD | 05/11/2013 | 08:37:28 AM | $119.95 |
| 448006525 | 6005280029242534 | MD | 05/11/2013 | 08:38:52 AM | $119.95 |
| 496018333 | 6005280025791682 | MD | 05/11/2013 | 11:12:49 AM | $119.95 |

22. During May of 2013, NEW YORK DELI conducted 1402 SNAP transactions in total. Of those 1402 transactions, 329 of them follow a pattern indicative of structuring SNAP transactions to avoid trafficking detection. These 329 transactions were conducted by 147 cardholders (households). Each of the 147 cards was used twice within 24 hours at New York Deli to make large purchases. The two purchases made by each card often occurred within a minute of each other. Each transaction is for an amount much larger than the MD state average single purchase price. My experience has shown me that when store owners purchase large amounts of EBT benefits they divide the purchase into smaller transactions so that large suspicious sales do not show up on government computer systems. A sample of these structured transactions are displayed below:

**Table 4: High-dollar value swipes within 1 minute of one another**

| Card Number | State | Date | Time | Elapsed Tim | Amount | Xtn Type |
|---|---|---|---|---|---|---|
| 6005289030322763 | MD | 05/06/2013 | 01:26:07 PM | 00:00:27 | $94.00 | Purchase |
| 6005289030322763 | MD | 05/06/2013 | 01:26:34 PM | 00:00:27 | $56.00 | Purchase |
| 6005280029152808 | MD | 05/14/2013 | 12:59:29 PM | 00:00:27 | $103.00 | Purchase |
| 6005280029152808 | MD | 05/14/2013 | 12:59:56 PM | 00:00:27 | $97.00 | Purchase |
| 6005280025497033 | MD | 05/15/2013 | 10:01:29 AM | 00:00:27 | $103.00 | Purchase |
| 6005280025497033 | MD | 05/15/2013 | 10:01:56 AM | 00:00:27 | $97.00 | Purchase |
| 6005289028514744 | MD | 05/15/2013 | 02:31:40 PM | 00:00:27 | $106.00 | Purchase |
| 6005289028514744 | MD | 05/15/2013 | 02:32:07 PM | 00:00:27 | $94.00 | Purchase |
| 6005280025378266 | MD | 05/07/2013 | 12:56:13 PM | 00:00:28 | $106.00 | Purchase |
| 6005280025378266 | MD | 05/07/2013 | 12:56:41 PM | 00:00:28 | $94.00 | Purchase |
| 6007600802030460705 | PA | 05/10/2013 | 08:05:02 AM | 00:00:28 | $103.00 | Purchase |
| 6007600802030460705 | PA | 05/10/2013 | 08:05:30 AM | 00:00:28 | $73.00 | Purchase |
| 6005289024930688 | MD | 05/11/2013 | 04:01:27 PM | 00:00:28 | $101.50 | Purchase |
| 6005289024930688 | MD | 05/11/2013 | 04:01:55 PM | 00:00:28 | $49.93 | Purchase |
| 6005280027887801 | MD | 05/26/2013 | 07:04:58 PM | 00:00:28 | $103.00 | Purchase |
| 6005280027887801 | MD | 05/26/2013 | 07:05:26 PM | 00:00:28 | $49.93 | Purchase |
| 6005289029854768 | MD | 05/04/2013 | 09:44:39 AM | 00:00:29 | $99.93 | Purchase |
| 6005289029854768 | MD | 05/04/2013 | 09:45:08 AM | 00:00:29 | $59.97 | Purchase |
| 6005280027861475 | MD | 05/08/2013 | 12:04:04 PM | 00:00:29 | $102.00 | Purchase |
| 6005280027861475 | MD | 05/08/2013 | 12:04:33 PM | 00:00:29 | $98.00 | Purchase |
| 6005280020960167 | MD | 05/10/2013 | 11:04:41 AM | 00:00:29 | $103.00 | Purchase |
| 6005280020960167 | MD | 05/10/2013 | 11:05:10 AM | 00:00:29 | $97.00 | Purchase |
| 6005289023710180 | MD | 05/11/2013 | 09:37:47 AM | 00:00:29 | $107.00 | Purchase |
| 6005289023710180 | MD | 05/11/2013 | 09:38:16 AM | 00:00:29 | $93.00 | Purchase |

23. A review of transactions conducted at NEW YORK DELI from March 1, 2013 to May 31, 2013 disclosed these patterns of transaction activity continue to make up a substantial portion of the transactions conducted at the store. Based on my training and experience and the collective experience of other agents of the USDA, I know that a high volume of such transactions is indicative of SNAP benefits trafficking.

### C. Investigative Operations at New York Deli

24. On May 15, 2012, a Cooperating Witness (CW) working under the direction of Special Agent Stan Wojtkonski of USDA OIG exchanged SNAP benefits for cash with NEW YORK DELI owner NAGI. While equipped with a recording device, the CW entered NEW YORK DELI and approached NAGI at the store register. The CW displayed a SNAP EBT card and asked NAGI if he would buy $200 in stamps (SNAP benefits are still commonly called food stamps). NAGI replied affirmatively and subsequently purchased $199.90 in SNAP benefits from the CW in exchange for $100.00 in cash which NAGI took out of the cash register. NAGI asked the CW to swipe his/her card twice and enter the PIN twice. After the transaction, the CW exited the store, met the surveillance team and relinquished the evidence to investigating agents. The CW positively identified NAGI from a driver's license photo. This meeting was recorded and contemporaneously monitored by USDA-OIG Special Agent Wojtkonski as well as assisting agents from the FBI and CBP.

25. On June 14, 2012, following the same procedure, the CW entered NEW YORK DELI. The CW, while carrying a recording device, approached an unknown female employee who was behind the counter. The CW told the employee that he/she had $209.00 in stamps he/she was trying to get rid of. The female employee agreed to buy the benefits, and told the CW that she would have to swipe his/her card twice. She took the CW's investigative EBT card and did so while the CW entered the PIN on the keypad twice. The employee retrieved $104.00 in cash from under the counter, not the cash register, and gave it to the CW along with .50 cents she retrieved from the register. After the transaction, the CW exited the store, met the surveillance team and relinquished the evidence to investigating agents. This meeting was recorded and contemporaneously monitored by USDA-OIG Special Agents and the FBI.

26. On January 7, 2013, following the same procedure, an undercover USDA OIG Special Agent (herein referred to as "UC") entered NEW YORK DELI with the same CW as noted above.

The UC, while carrying a recording device, approached store owner NAGI at the store register with the CW. The CW told NAGI that he/she had $200.00 in stamps and wanted to get rid of them for $100.00. NAGI took the investigative EBT card from the CW and swiped the card twice. The CW entered the PIN into the keypad twice. NAGI took $100.00 in cash out of the register and gave it to the CW. The UC then put his/her investigative EBT card into the bank-style door in the ballistic glass and told NAGI to take $200.00 off of it. NAGI swiped the card and then passed the PIN pad through the slot so the UC could enter the PIN. The UC then observed what he/she believed to be packaged synthetics (similar in method and result to marijuana) under the name "Scooby Snax" taped to the ballistic window of the counter. The UC asked the NAGI what the package was, and NAGI put his fingers to his lips and mimicked a smoking motion. The UC asked how much the product was, and NAGI said $10.00. The UC asked if he/she could use his/her EBT card to purchase the Scooby Snax. NAGI said the UC could, but the price would then be $20.00. The UC agreed to use $20.00 of EBT benefits from the investigative card to purchase the Scooby Snax. NAGI swiped the UC's card again and took $100.00 in cash out of the register drawer and placed it through the drawer in the ballistic glass along with a package of the Scooby Snax. After the transaction, the UC and CW exited the store, met the surveillance team and relinquished the evidence to investigating agents. This meeting was recorded and contemporaneously monitored by USDA-OIG Special Agents and members of the FBI and IRS CI.

27. On February 11, 2013, following the same procedure, a Confidential Human Source (CHS) under the direction of the FBI, accompanied by the same CW mentioned above, carried a recording device and investigative EBT card into NEW YORK DELI. NAGI was behind the counter. The CW approached the counter, pointed to the CHS, and told NAGI that NAGI knew what the CHS wanted to do. The CHS presented his/her investigative EBT card and told NAGI that it had $209.00 on it. The CHS told NAGI that he/she wanted to take all of it off and get half back in cash. NAGI asked the CHS how many transactions the CHS wanted to do to remove all the funds off the card. The CHS told NAGI to do two transactions. NAGI swiped the card twice, and the CHS entered the PIN twice. NAGI reached below the counter and retrieved $104.40 in cash which he passed to the CHS. They then exited the store and turned the evidence over to agents. This meeting was recorded and contemporaneously monitored by USDA-OIG Special Agents and members of the FBI and IRS CI.

28. On March 11, 2013, following the same procedure, the same CHS mentioned above carried a recording device and investigative EBT card into NEW YORK DELI. NAGI was in the store and there was another person present in the store that the CHS thought may be a vendor. When NAGI observed the CHS, NAGI put his fingers to his lips and motioned for the CHS to remain quiet while this other person was in the store. The CHS then waited for the other person to leave. After he left, the CHS approached NAGI at the counter and told NAGI that he/she had stamps to sell. NAGI asked how much and the CHS said $600. NAGI said that was too much. NAGI told the CHS he could do $400.00 right now and the CHS could come back later and sell him the other $200.00. The CHS handed NAGI the investigative EBT card. NAGI swiped the card 4 times and asked the CHS to enter the PIN 4 times. NAGI then retrieved $200.00 in cash from behind the counter and gave it along with one receipt to the CHS. This meeting was recorded and contemporaneously monitored by USDA-OIG Special Agents as well as agents of the FBI and IRS CI. The evidence was turned over to agents.

29. During the aforementioned transactions, NAGI and his unidentified employee collectively conducted 5 fraudulent SNAP EBT transactions during which they purchased approximately $1,437.00 in investigative SNAP benefits.

## V. THE ADJOINED RESIDENCE AT 1207 WEST BALTIMORE STREET, BALTIMORE MARYLAND

30. A query of the Maryland Department of Assessments and Taxation database revealed that 1207 W. Baltimore St, Baltimore, MD 21223 is currently owned by "MOHAMED NAGIE".

31. The building is a three story building and NEW YORK DELI occupies only the first floor.

32. On July 11th, 2013, surveillance was conducted at NEW YORK by agents of the FBI.

    a. At 5:45 am they observed the roll down door covering the front entrance of NEW YORK closed. They also observed a bronze Ford SUV, MD tag 8AG9724, parked on the street in front of the store. This vehicle is registered to "ABDO MOHAMED ABDU NAGI".

  b. At approximately 8:35 am the roll down door securing NEW YORK was raised up. Agents did not observe anyone from the outside raising the door. This leads the affiant to believe the door was opened from inside the store.

  c. At approximately 8:39 am, agents observed NAGI exit the front door of NEW YORK and put money in the parking meter where his Ford SUV was parked.

33. On August 23, 2013 this affiant, along with Special Agent Stanley Wojtkonski of USDA-OIG, entered NEW YORK Deli located at 1207 W. Baltimore St, Baltimore MD 21223. At this time NAGI was working at the store alone. I identified myself and asked NAGI a series of pretext questions about a fictitious robbery in the area. NAGI responded that his store was open 8 a.m. until 9:30 p.m. He also stated that he lived above the store with his wife and child and they were the only people that lived in the building. There is only one exterior entrance to the building and that is through the front door of the store. Access to the above floors is gained through an interior door located at the rear of the store. There were no desks, filing cabinets or other office furniture visible in the store within which could be stored business records.

## VI. PROPERTY SUBJECT TO FORFEITURE

34. I know that criminal forfeiture is governed by the procedures in 21 U.S.C. § 853.

35. In the case of criminal forfeiture, I also know that the Government is entitled to seize and forfeit substitute property if the property involved in the drug distribution offense is no longer available. *See* 21 U.S.C. § 853(p); *United States v. Billman*, 915 F.2d 916, 920 (4th Cir. 1990).

36. Based on my training and experience, I know that property subject to forfeiture may be seized pursuant to a warrant based on probable cause. *See* 18 U.S.C. § 981(b); 21 U.S.C. § 853(f). I am further advised that "probable cause" means simply a reasonable ground for belief that goes beyond mere suspicion but need not amount to prima facie proof. 820 F. Supp. at 251-52. This standard requires courts to make a practical, common sense decision whether, given all the circumstances, a fair probability exists that the property to be forfeited

was involved in or was the subject of a transaction violating 5324.  *Id.  See also United States v. Thomas,* 913 F.2d 1111, 1114 (4th Cir. 1990).

37. Accordingly, to seize the property from the referenced bank accounts in this case for criminal forfeiture, the Government must show that there is probable cause to believe that the violations occurred, and that the funds in the accounts are equal to or less than the funds involved in the violations so that the funds presently in the accounts may be forfeited as substitute assets.

38. With respect to the tracing requirement, I am advised that for the purpose of establishing probable cause, the Government is not required to strictly trace the funds in the accounts at the time of seizure to the offense giving rise to the forfeiture.  Rather, given the volatility in bank accounts, it is sufficient to show that a given sum of forfeitable money was deposited into an account and that the amount to be seized does not exceed that sum.  *See United States v. Dupree,* 781 F. Supp. 2d 115, 135 (E.D.N.Y. 2011) (there is probable cause for the seizure of funds in a bank account if there is a showing that the value of the criminal proceeds deposited into the account exceeds the current balance in the account or the amount the Government is seeking to seize; the probable cause affidavit does not have to negate the possibility that legitimate funds have replaced the criminal proceeds; that is an issue for trial).

39. I am further advised that pursuant to 18 U.S.C. § 984, currency in a bank account is considered fungible for one year from the date of the offense.  Accordingly, even if the Government were required to establish strict tracing of forfeitable funds to a bank account to satisfy the probable cause requirement for civil forfeiture, any volatility in the bank account since August 16, 2012 may be disregarded.  *See United States v. $79,650 Seized from ...Afework,* 2009 WL 331294, *3 (E.D. Va. Feb. 9, 2009) (§ 984 "loosens the burden on the Government to 'trace' forfeitable property" if the property is fungible property found in the same place or account as the directly forfeitable property, and the action is commenced within one year)).

40. Moreover, to the extent that any or all of the funds directly traceable to the property involved in the offenses have become unavailable, the Government is entitled to criminally forfeit substitute assets up to the value of the missing property.  Accordingly, even if the funds

presently in the referenced accounts were not traceable to the offenses, they would be subject to seizure and forfeiture as substitute assets in a criminal forfeiture case pursuant to 21 U.S.C. § 853(p) *see also United States v. Billman*, 915 F.2d 916, 920 (4th Cir. 1990).

41. A federal grand jury subpoena was used to obtain NEW YORK DELI's Retailer Agreement banking information from Xerox (formerly ACS). ACS was the third party processor contracted by the state of MD to deliver EBT funds to redeeming stores. The Retailer Agreement is the contract (in the case signed directly with ACS) that dictates what bank account a store would like to have ACS deposit their EBT redemptions into. The subpoena revealed that NEW YORK DELI had designated account number 9852702936. This account is with M&T Bank.

42. A review of bank records disclosed that account #9852702936 was opened on December 15, 2010 in the name of New York Deli and Grocery Inc. The authorized signator on the account is Abdo M Nagi.

43. From February 2011 thru June 2013, M&T Bank account number 9852702936 has received approximately $1,309,568.99 in SNAP EBT reimbursements from the Federal Reserve Bank via electronic funds transfer, which were issued under the authority of FNS pursuant to the Food and Nutrition Act. These reimbursements have consistently been deposited in said account.

44. The balance of M&T Bank account number 9852702936 as of September 9, 2013 is $3,790.50.

45. Based on fraud analysis detailed above, there is probable cause to believe that from February 2011 through the end of July 2013, after tripling the CS average to $27.66, and excepting all purchases during that time frame that fall below $27.66, the amount of suspected fraudulent transactions at NEW YORK DELI AND GROCERY would be $1,244,924.24. Therefore, there is probable cause to believe that the funds up to and including $1,244,924.24 held in M&T Bank account number 9852702936 are the fruits of crimes, including: fraud associated with the Supplemental Nutrition Assistance Program in violation of Title 7, United States Code, Section 2024; wire fraud in violation of Title 18, United States Code, Section 1343; access device fraud in violation of Title 18, United States Code, Section 1029; and Money Laundering in violation of Title 18, United States Code, Section 1956.

15

46. Based on the information contained in this affidavit, I respectfully request issuance of a seizure warrant for funds held in M&T Bank account number 9852702936 in the name of New York Deli and Grocery Inc. Further, based upon the my training and experience, in the event that this Court grants this application for seizure warrant, I believe there is a likelihood that the account will continue to receive ACH credits of funds representing proceeds of the above described fraud for a period of time after such warrants are initially executed. It is probable that those involved in the above-described conduct will be unable to promptly stop the flow of funds. As such, I request that any warrant issued by this court order the receiving bank to allow funds to be credited to the account but to disallow any of such funds to be debited out of the accounts for any reason for a period of 14 days from the issuance of such warrants. I ask that FBI be allowed to periodically remove such funds after initial execution of any seizure warrant during that 14 day period.

## VII.   COMPUTER DATA

47. Based on my training and experience and information provided to me by agents and others, I know that convenience stores commonly use computers to perform business calculations, compile and store inventory records, purchase inventory, issue payroll checks, and maintain employee records. Authority is requested to search any computer hardware or computer-related equipment capable of creating and/or storing information in electronic or magnetic form. Computer-related equipment includes, but is not limited to, central processing units, and/or peripheral equipment used to facilitate the creation, transmission, encoding or storage of information. I seek the authority to search for any or all information and/or data stored in the form of magnetic or electronic encoding on computer media, or on media capable of being read by a computer, or with the aid of computer-related equipment. This media includes, but is not limited to, floppy disks, fixed hard disks, removable hard disk cartridges, tapes, laser disks, videocassettes, CD-ROMs, zip disks, smart cards, memory sticks, memory calculators, PDAs, USB flash drives and/or other media that is capable of storing magnetic coding.

48. Based on my training and experience and information provided to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored

16

on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during a search of a premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

49. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

50. Searching computer systems requires the use of precise, scientific procedures that are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or unintentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conduct a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

51. The volume of data stored on many computer systems and storage devices typically will be so large that it is highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-sided pages of text. A single gigabyte of storage space or 1,000 megabytes is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would completely fill a 35' x 35' x 10' room to the ceiling. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

52. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and

17

extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard", is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography". For example, by using steganography a computer user can conceal text in an image file, which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

53. In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

   a. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized as set forth in Attachment B.

   b. In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth in Attachment B. In addition, the computer personnel may search for and attempt to recover "deleted", "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth in this attachment.

   c. The agents executing this warrant will file a return with the Court within 10 days of the search. The return will describe the computer(s) and other digital storage media seized, and give an estimate of the time needed by trained forensic agents to complete a preliminary search of those items. If that preliminary search indicates that an item does not contain data within the scope of the warrant, the government will promptly make that item available for pickup by the owner.

54. Based on my training and experience, and the collective experience of other law enforcement officers, I know that product invoices, sales receipt confirmations, product delivery confirmations, vendor contact information, account numbers, vendor related correspondence,

and other information that can be used to identify food purchases and sources are delivered and kept electronically in email form. The advent and proliferation of Personal Data Assistants (PDAs) and Smart Phones that can connect directly to the internet to receive and store email as well as access websites, such as vendor websites for ordering purposes, means that owners of stores can now keep much of their record keeping and vendor lists stored in their phones and on their persons at all times.

## VIII.  **CONCLUSION**

55. Based on my training and experience, and the collective experience of other law enforcement officers involved in this investigation, I know that convenience stores such as NEW YORK DELI must maintain records to facilitate operation of the business. Product invoices detailing the volume of wholesale food purchased by the store can be compared to the corresponding retail sales negotiated using SNAP benefits. Based on this comparison, it can be determined whether a particular store has adequate inventory to support the volume of food purportedly purchased with SNAP benefits.

56. Based on my training and experience, and the collective experience of other law enforcement officers involved in this investigation, principles (owners, officers, and managers) of businesses dealing in the illegal purchase of SNAP benefits commonly maintain evidence of assets purchased with the proceeds of such illegal enterprises, including but not limited to, books, records, receipts, notes, logs, ledgers, canceled checks, bank statements, telephone bills, electronically stored records, and other sources of information relating to the purchase, sale, transfer, or concealment of illegally obtained proceeds and assets.

57. As stated above, there is probable cause to believe that within the premises of NEW YORK DELI SERVICE AND CONVIENCE MARKET located at 1207 West Baltimore Street, Baltimore St, to include all computers and containers therein, will be evidence and instrumentalities of violations of Title 7, United States Code, Section 2024 and Title 18, United States Code, Section 1343, to include: SEE ATTACHMENT B1.

58. Based on the information contained in this affidavit, I respectfully request issuance of a search warrant for NEW YORK DELI SERVICE AND CONVIENCE MARKET located at 1207 West Baltimore St, Baltimore, MD 21223.

59. As stated above, there is probable cause to believe that within the residence located at 1207 West Baltimore Street, Baltimore St, to include all computers and containers therein, will be evidence and instrumentalities of violations of Title 7, United States Code, Section 2024 and Title 18, United States Code, Section 1343, to include: SEE ATTACHMENT B2.

60. Based on the information contained in this affidavit, I respectfully request issuance of a search warrant for the residence located at 1207 West Baltimore St, Baltimore, MD 21223.


I declare under penalty of perjury that the forgoing is true and correct to the best of my
knowledge.

_____
Special Agent Jeffrey Weiland
Federal Bureau of Investigation


Sworn to before me, and subscribed in

my presence, this _13_ day of September, 2013.


_____
Honorable Susan K. Gauvey
United States Magistrate Judge